*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

Nos. 04-3389/3436

EMMETT JORDAN,

*Plaintiff-Appellee/
Cross-Appellant,*

Nos. 04-3389/3436; 05-3808

*v.*

CITY OF CLEVELAND,

*Defendant-Appellant/
Cross-Appellee.*

No. 05-3808

EMMETT JORDAN,

*Plaintiff-Appellant,*

*v.*

CITY OF CLEVELAND,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01280—James S. Gallas, Magistrate Judge.

Argued:  April 18, 2006

Decided and Filed:  July 6, 2006

Before:  MOORE and GIBBONS, Circuit Judges; SHADUR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jose M. Gonzalez, CITY OF CLEVELAND LAW DEPARTMENT, Cleveland, Ohio, for Appellant.  Dennis R. Thompson, Christy B. Bishop, THOMPSON & BISHOP, Akron, Ohio, for Appellee.  **ON BRIEF:** Jose M. Gonzalez, Amy E. Marquit Renwald, Theodora M. Monegan,

_____

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

Gail D. Baker, CITY OF CLEVELAND LAW DEPARTMENT, Cleveland, Ohio, for Appellant. Dennis R. Thompson, Christy B. Bishop, THOMPSON & BISHOP, Akron, Ohio, for Appellee.

--------

**OPINION**

--------

MILTON I. SHADUR, District Judge.  This opinion treats with three appeals, all stemming from the suit brought by Emmett Jordan ("Jordan") against his former employer, the City of Cleveland ("Cleveland"), charging racial discrimination, racial and retaliatory harassment and retaliation in violation of Title VII of the Civil Rights Act (42 U.S.C. §§2000e-2000e-17), 42 U.S.C. §1981 and Ohio Rev. Code Ann. §§4112.02 and 4112.99.  Jordan's racial discrimination claims were dismissed by the district court via summary judgment.  Then, after a 13-day trial on Jordan's five surviving counts, the jury found in Jordan's favor on three of them.

In Case No. 04-3389 Cleveland appeals from the denial of its Fed. R. Civ. P. ("Rule") 50 motion and argues that the jury was incorrectly instructed on Jordan's retaliatory harassment claim. In Case No. 04-3436 Jordan cross-appeals the district court's refusal to permit him to put on evidence of economic damages.[1]  And finally, in Case No. 05-3808 Jordan appeals the district court's determination and award of "reasonable" attorney's fees.  For the reasons discussed below, we **AFFIRM** (1) the district court's denial of Cleveland's Rule 50 motion and (2) its rejection of Cleveland's objection to the retaliatory harassment instruction, we **REVERSE** the district court's rulings on economic damages and attorney's fees, and we **REMAND** the case for further proceedings consistent with this opinion.

**Background[2]**

Cleveland's Division of Fire ("Division") comprises six battalions, four on the east side of the Cuyahoga River and two on the west side (J.A. 196).[3]  Battalions are numerically designated, and each is headed by a Battalion Chief (*id*.).[4]  Each battalion consists of a set of companies that are physically located at numerically designated station houses and are headed by a Captain (*id*). Firefighters in the companies are assigned to one of three 24-hour shifts (A, B and C), with firefighters typically working a one-day-on, two-days-off schedule (J.A. 197).  Although the Captain heads the station house, he or she works only a single shift, with the other two shifts being run either by a subordinate captain, by a roving officer or by an "acting Lieutenant" (a firefighter designated as a Lieutenant) (J.A. 198, 2437-38).

--------

[1]Jordan also cross-appeals the district court's ruling that precluded Jordan from presenting to the jury the "Probable Cause" determination reached by the Equal Employment Opportunity Commission ("EEOC"), as well as the official statements made to EEOC by the parties.  But Jordan has expressly conditioned that appeal on our finding a new trial to be warranted on the retaliatory harassment claim.  Because we affirm the jury's verdict on that claim, we need not consider that aspect of the cross-appeal:  It is moot.

[2]We are constrained to note that Cleveland's appellate briefing presented a totally different--and impermissibly one-sided--version of the facts.  That does violence to the fundamental principle that on an appeal from an unfavorable verdict the appellant (like the reviewing court) must treat the record in a manner most favorable to the appellee, with all reasonable inferences drawn in the same direction.

[3]This opinion cites to the Joint Appendix as "J.A. --," to the Joint Appendix on Fees as "J.A.F.--" and to Cleveland's Appendix on Fees as "C.A.F.--."

[4]Within the Division the ranking order of officers is: Chief, Assistant Chief, Battalion Chief, Captain, Lieutenant and then firefighters of various grades and seniority (J.A. 197).

Even though 51% of Cleveland's population is African-American, less than 22% of its firefighting force was black. That disparity was reflected to an even greater degree among the Division's officers as of February 2004: Although two out of seven Assistant Chiefs were black, at least one of them had been promoted only after filing a discrimination suit, and similarly there were only three black Battalion Chiefs out of a total of 29, two black Captains out of a total of 62 and 25 black Lieutenants out of a total of 178 (J.A. 2244-46).[5] Most of the black officers and black firefighters work in station houses in Battalion 5, pejoratively labeled "Monkey Island" (J.A. 1594-95, 1667-68, 2389, 2535).

There are generally no black officers and very few black firefighters assigned to houses on the west side of the city (J.A. 2402-06, 2777-83). Jordan, however, was one of the exceptions to that pattern. In 1987 the Division hired Jordan and sent him to work on the west side (J.A. 1934, 1936-37). While stationed there Jordan was called "Sambo," was accused of being a "Welfare Firefighter" and was subjected to a number of offensive racial jokes and racist graffiti (J.A. 1945-47). For example, at 36's house there was a "Wall of Hate," a partition erected by white firefighters with derogatory comments directed toward black firefighters--indeed, that "Wall" remained in place until 1999, when one of the two black Captains in the Division tore it down (J.A. 2544).[6]

Jordan also experienced more general isolation while stationed at west side houses. Dinnertime and relaxation in the television room were particularly difficult (J.A. 1948). For example, now-Battalion-Chief Daryl McGinnis (one of the three blacks in that position) recalled being on a white shift and asking what was for dinner, whereupon the cook told him: "Coon soup--a combination of a tomato, a black man, and a pepper" (J.A. 2253). Moreover, black entertainment channels on the television were typically blocked, and when a black firefighter would venture into the television room his white co-workers would drift out, leaving him alone (J.A. 1592, 1948, 2304-05).

In 1995 Jordan transferred to 11's house (J.A. 1959). When he first arrived there, both the house and Jordan's shift were largely white (*id*.). But after his arrival white firefighters on his shift transferred out and several black firefighters transferred in (J.A.1960). As this was happening, Jordan claimed, "the atmosphere started to change there" (*id*.). For example, white firefighters started to lower the temperature as far as the thermostat would go before Jordan's predominantly black shift came on to work, and when Jordan and his co-workers complained they were told to "just get climatized" (*id*.).

Although the strife lessened as more white firefighters transferred out of 11's house and black firefighters transferred in, the calm was short-lived. In September 1998 Lieutenant James Hart

---

[5]This is not the first time that the Division has faced charges of race discrimination. As a result of the settlement of earlier charges, the Division still operates under a consent decree (the "Headen decree") for hiring, although the consent decree as to promotions expired in 1995. Relatedly, there is an organization of white firefighters called CAFFA or "Concerned American Firefighters Association" (which only recently changed its name from "Caucasian-American Firefighters Association") that "is fighting affirmative action, Headen decree hiring" (J.A. 1665). Additionally, with respect to promotions there are two informal, white-only social networking clubs--the Cooz and Anchor clubs--that assertedly provide a "fast track" to advancement within the Division (J.A. 982-83, 1689-90, 1847-48, 1952, 2270-73).

[6]Other evidence confirmed the existence of a hostile environment. For instance, white firefighters told one joke in which a white man, speaking to a black man who was asking him for a nickel, says (J.A. 1946):

"A nickel? All you need is a nickel to get back to Africa?" And he says "Yes." And he said "Hey, here's a quarter. Take four niggers back with you."

As a further example, during Christmas at 4's house stockings were hung up for each firefighter--and Jordan's was a black stocking with a black face painted on it (J.A. 1953).

("Hart") was sent to 11's house and assigned to Jordan's shift A (J.A. 1963). On the second day that he was assigned to shift A, Hart announced that he wanted "certain people" off of his shift and that he would do whatever it took to drive those firefighters out (J.A. 2756, 2763). As one firefighter noted, those "certain people" were almost exclusively the black firefighters, including Jordan;[7] Hart was particularly confrontational, disrespectful and caustic toward them (J.A. 2763).

Jordan sought out Captain Kelly ("Kelly") and Battalion Chief Michael Heil ("Heil") to address the problems he was having with Hart. Kelly dismissed Jordan's complaints of racial discrimination, while Heil "shooed" Jordan away (J.A. 1969-70). Indeed, shortly after speaking with Jordan, Heil held a roll call during shift A at 11's house during which he called 11's house a "shithouse," told the men they were stuck with Hart and warned them that if they ever went over his head and took their race complaints "downtown," they would regret it (J.A. 1832-33, 1971, 2745). Hart additionally and specifically warned Jordan that if he complained it would only create "trouble" for him (J.A. 2745).

Nonetheless, in October and November 1998 Jordan (along with a host of other black firefighters at 11's house) filed internal Form 10s and a charge with the Division's EEOC officer Paul Stubbs ("Stubbs"), targeting Hart with asserted discrimination and harassment (J.A. 2744-52, 2754-55, 2757).[8] These complaints were given to Division Chief Kevin Gerrity ("Gerrity") to be appropriately forwarded within the Division.

Hart's treatment of Jordan only further soured after Jordan filed those charges. Hart went out of his way to assign Jordan demeaning chores and "extra assignments, extra duties...duties that...generally required a full company to do like clean the ladders, as the driver of the truck I was then ordered to do them myself" (J.A. 1979). Hart would additionally suspend policy to require excess drilling, but only on the days that Jordan was working (J.A. 2805).

In late 1999 Jordan still had not heard anything about the EEOC charges he had filed in 1998 (J.A. 1988). Jordan inquired at Cleveland's EEOC, where he was told that there was no record of any discrimination charges filed by him or anyone else at the Division in 1998 (J.A. 1988-89).

Meanwhile Jordan's problems at 11's house continued. On December 7, 1999 he was inexplicably denied "acting time" via the placement of a roving officer on his shift--a placement that caused the acting time to be assigned to that officer. Firefighters receive acting time--they act as officers with regard to responsibility, with a corresponding increase in pay--when a shift otherwise lacks an officer, either because the officer worked a different shift or because there is no roving officer assigned to the shift. According to Division policy, acting time is generally granted on the basis of (1) vacancy in the house and (2) seniority in the battalion (J.A. 3296).

On December 8 Jordan submitted a Form 10 and wrote a "Letter of Complaint" to Gerrity asking why he had been denied acting time the day before (J.A. 1990-92, 2772-74). In his letter Jordan explained that after investigating the matter, he learned that on December 7 a roving officer also had been placed at 26's house, which otherwise would have had a black acting Lieutenant (J.A. 1991-92). As a result of that placement of roving officers in 11's and 26's houses, two firefighters more junior to Jordan were in charge of shifts elsewhere in the city, in contravention of Division policy (J.A. 2773). Not only was Jordan never given an explanation for the denial of acting time,

---

[7] Fritz Haiss was the only white firefighter in that group (J.A. 2763).

[8] Form 10 is an interdepartmental memorandum used by the Division to report all personnel matters (J.A. 1703).

but he was also expressly told by new house Captain Robert Readinger ("Readinger") not to push the matter or he would be removed from 11's house (J.A. 1994-95).[9]

Over the next several months Jordan continued to be denied acting time--despite Readinger's threat, he also continued to inquire about what he perceived as racial bias in the granting of acting time (J.A. 2832). In March 2000 Jordan was finally told that he was denied acting time as "punishment" for his failure to conduct building inspections properly while serving as an acting officer in the past (J.A. 2792). After hearing that, Jordan wrote a letter to his local union, asking it to file a grievance on his behalf (J.A. 2787). Jordan explained in his letter that Hart and Readinger had falsely accused him and that he had properly completed all building inspections requested of him (J.A. 2787-88). On the very next day Readinger admitted that the denial was based on "several miscommunications" (J.A. 2876). In fact there were, however, no "miscommunications." Instead Readinger told Jordan that Readinger's immediate superior, Assistant Chief A.C. Norman ("Norman"), had told Readinger to send in the letter about Jordan failing to complete inspections "so that they can have an excuse for sending officers there when [Jordan] was the senior man" (J.A. 2221). In addition, Hart told Jordan that he and Norman were drinking buddies and that Hart was handling the acting time situation (*id.*).

On March 24, 2000 Readinger made good on his earlier promise to remove Jordan from 11's house if he complained and ordered Jordan involuntarily detailed to 36's house.[10] When he arrived at 36's house, Lieutenant Hatzsegi ("Hatzsegi") announced to all that Jordan was "11's problem sent there for 36 to handle" (J.A. 1998). Jordan was immediately subjected to a number of derogatory racial jokes and open hostility from the other shift firefighters (*id.*). For example, although Jordan was the senior firefighter on his shift at 36's house, the white firefighters drafted a grievance stating that they did not want him "taking" their acting time and that he should be detailed out just as if he were the junior man (J.A. 2012). Two days later Jordan was sent back to 11's house and from there was detailed all over the city. Throughout that entire period Jordan was denied acting time.

Jordan attempted to file a Form 10 relating what Hatzsegi and the other firefighters at 36's house had said, as well as stating his concerns that everyone in the Division knew about his discrimination and retaliation complaints even though they were supposed to be confidential (J.A. 2819-21). But when Jordan submitted the form to Heil for signature and forwarding to "downtown," Heil refused, saying he was not going to "rubberstamp this bullshit" against his men who were "good officers" (J.A. 2014). As a result, Jordan filed the form directly at Division headquarters himself (J.A. 2015).

On June 9, 2000 Cleveland's EEOC issued a "No Probable Cause" finding on the discrimination charges that Jordan had filed in 1998 (J.A. 3380). Notably, neither Jordan nor any of the other firefighters cited in Jordan's charge had been interviewed. Seven days later Jordan filed another formal complaint of discrimination and harassment with EEOC and the Ohio Civil Rights Commission, detailing events from 1998 through the current date (J.A. 2827-28).

---

[9] Jordan testified that, following the assertion of some complaints of racial harassment at 11's house, Readinger (who had earlier been disciplined at 41's house for using racial slurs) was sent to 11's house to "straighten [them] out" (J.A. 1630).

[10] Captain Michael Odum ("Odum"), Hart's direct supervisor, recommended separating Jordan from Hart (J.A. 2810-12). But after Jordan was transferred to 36's house, Odum made it clear that the problem was Hart and not Jordan and that he (Odum) had never suggested transferring Jordan out of 11's house (*id.*; see also J.A. 2382-83). Odum thought it wrong to punish the victim and felt that the problem could be resolved by merely putting Hart and Jordan on different shifts at 11's house (J.A. 2387).

In the interim, on June 12, 2000 Jordan was involuntarily transferred to 20's house, an all-white house on the west side (J.A. 2029-2031). At 20's house Jordan was subjected to a number of the same problems that he had faced earlier, including isolation, hostility and disparate treatment. For example, one day he missed a run and was put up on charges (J.A. 2031). Those charges, however, were eventually dropped after Stubbs notified Gerrity that no white person had ever been subjected to charges for the same behavior (J.A. 2564-65).

Just one month later Jordan was again transferred, this time to 26's house in Battalion 5 (J.A. 2032-33). Two of the shifts at 26's house--A and B--were all-black shifts except for the officers in charge, while C was an all-white shift. Although Jordan preferred to be on shift C because there he would be the senior firefighter and could keep his vacation, he was all but forced to accept a position on shift B (J.A. 1675, 2048-49). Over the next several months--despite his being told by 26's house Captain Henry Miklowski ("Miklowski") to stop "making false accusations about good firemen" and that "downtown" was "laughing" at him for his complaints of racial discrimination--things were relatively quiet at 26's house (J.A. 2069-70, 2879). It was not until April 2001 that more trouble began.

Supposedly 26's house had a tradition of putting any turnout gear[11] left from previous shifts into a frayed metal basketball hoop at the house, although the "tradition" was kept only by shift C (J.A. 1675-76, 2315, 2319). Jordan's gear ended up in the hoop several times (J.A. 2034). On April 10, 2001 Jordan arrived for work to find his turnout gear in the hoop again, and when he went to get it out of the hoop he discovered that it was torn (J.A. 2037). That same day Jordan found taped to his locker a notice by Miklowski that he was ordering a turnout gear inspection, the first ever such inspection in Jordan's time at 26's house (J.A. 2041). Exasperated, Jordan said to some of his co-workers (J.A. 2055; and see J.A. 2061):

> I don't know what I'm going to have to do. Am I going to have to maybe fight somebody to get someone to stop putting my gear in the hoop?

But Jordan instead telephoned Miklowski, who admitted that he was the one who put Jordan's gear in the hoop and ordered the inspection (J.A. 2045). After Jordan hung up, Miklowski came to the station house and a confrontation between the two ensued (J.A. 2053). In a meeting held later that same morning among Battalion Chief John Plues ("Plues"), Miklowski, Jordan and Lieutenant Fallon ("Fallon"), Miklowski admitted to being the aggressor (J.A. 2058-61). Despite that admission, it was Jordan who was warned that he would be suspended if he took the matter "downtown" and that it was wrong to "threaten the guys" (J.A. 2060). Jordan had explained that he had not made threats, but if anyone took it that way he would apologize (J.A. 2061). Fallon said that it "isn't right" that a man's gear would get ripped and offered to tape up the sharp corners of the hoop (J.A. 2064). Plues told him not to (J.A. 2065).

On Jordan's next working day Miklowski, who was off duty, made a special trip in and called a formal roll call and "gear inspection" (J.A. 2071). Miklowski then announced that "Emmett has something to say to everybody" (*id.*). Jordan was taken by surprise, and when told by Miklowski that he was going to "apologize to everybody," Jordan denied ever making such a promise. Miklowski then called him "less than a man" and a "coward" (J.A. 2072). After that exchange, Jordan came in only a few times on light duty before taking disability retirement in 2002 because of stress (J.A. 2088).

Notably, on April 5 (just days before the turnout gear incident) Jordan had received from EEOC a finding of "Probable Cause" in his favor--as well as for blacks as a class--for claims of

---

[11]Turnout gear is the protective gear worn by firefighters. It is considered to be "sacred" and essential for safety (J.A. 2449-50).

unlawful discrimination, retaliation and hostile work environment (J.A. 3381-82). On July 2, 2002 Jordan timely filed the action now on appeal (J.A. 20).

Jordan's Complaint asserted nine overlapping claims under state and federal law, charging racial discrimination, racial harassment and retaliation (J.A.F. 3–8). When Cleveland thereafter moved for summary judgment on all of Jordan's claims, the district court granted that motion only as to Jordan's racial discrimination claims (J.A.F. 17-40; C.A.F. 46).[12]

All of Jordan's remaining claims proceeded to trial, in which the jury found (1) in Jordan's favor on his claims of (a) retaliation, (b) racial harassment by a supervisor without a tangible employment action and (c) retaliatory harassment without a tangible employment action and (2) in Cleveland's favor on Jordan's claims of (a) racial harassment by a supervisor with a tangible employment action and (b) racial harassment by a co-worker without a tangible employment action. Jordan was awarded $175,000 in compensatory damages. These appeals followed.

## Case No. 04-3389: Cleveland's Appeal

**Rule 50 Motion**

Cleveland argues that the district court erred by failing to grant its Rule 50 motion as to Jordan's successful claims of (1) retaliation, (2) racial harassment and (3) retaliatory harassment. As we have reconfirmed in *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005), "We review a district court's denial of...a renewed motion for judgment as a matter of law *de novo*." Judgment as a matter of law is appropriate when "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party" (*Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)). Moreover, in entertaining a Rule 50 motion, we are mindful of the quotation from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), which admonishes that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." With that standard in mind, we turn to Jordan's claims.

### 1. Retaliation

Cleveland argues that the district court should have dismissed Jordan's retaliation claim because Jordan did not suffer an adverse action, which we have characterized as one that is "materially adverse" (*Koscis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996), reaffirmed en banc in *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 797-98 & n.3, 800 (6th Cir. 2004)). We have now been provided the definitive content of that "materially adverse" concept by the Supreme Court, which on June 22 affirmed our *White* decision *sub nom. Burlington N. & Santa Fe Ry. v. White*, No. 05-259, 2006 WL 1698953. Indeed, the standard enunciated by the Supreme Court is even less demanding of a plaintiff employee than that stated in our en banc majority opinion--here are the relevant excerpts (*10-*11, with case citations omitted and with emphasis in original).

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the

---

[12]One day later, despite never having expressly pleaded or pursued such a claim, Jordan stipulated to a without-prejudice dismissal of any denial-of-promotion charge (J.A.F. 119).

challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

We speak of *material* adversity because we believe it is important to separate significant from trivial harms.

\*          \*          \*

We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.

\*          \*          \*

We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.

\*          \*          \*

By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

Before we turn to the merits on that score, we must address Jordan's challenge to our jurisdiction over that claim, in which he argues that Cleveland failed to present the issue in either of its Rule 50 motions. Rule 50(a)(2) requires that a movant "specify the judgment sought and the law and facts on which the moving party is entitled to judgment." But Rule 50 "does not require technical precision in stating the grounds of the motion" (9A Charles Wright & Arthur Miller, *Federal Practice and Procedure* §2533, at 310 (2d ed. 1994)). It rather requires only that the grounds "be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion" (*id*. at 310-11).

In this instance Cleveland discussed Jordan's inability to make out an adverse action when it moved for judgment as a matter of law at the end of Jordan's proof (J.A. 2612). Although Cleveland expressly focused on the turnout gear incident in that discussion, it also spoke at length about Jordan's claimed denial of acting time (J.A. 2615-16). Cleveland argued that Jordan was appropriately denied acting time because Captain Readinger found that Jordan was not performing building inspections. Moreover, Cleveland claimed that the decision to place roving officers in 11's house instead of providing Jordan with acting time was a "business decision" within the discretion of the Division (*id*.). Those arguments not only reflected Cleveland's dispute with Jordan's characterization of the denial of acting time as race-related but also signaled that Cleveland did not believe any such denial to be an adverse action because Jordan was never entitled to acting time in the first instance. We find that Cleveland has met the test for a Rule 50 motion and preserved its "adverse action" challenge (see, e.g., *Lynch v. City of Boston*, 180 F.3d 1, 13 n. 9 (1st Cir. 1999)).

With the jurisdictional challenge thus resolved, we address Cleveland's substantive contention. In that regard Jordan lists a number of arguably adverse actions, including unfair transfers, assignment to details with a significant loss of responsibility and the denial of acting time. Even apart from the first two of those, on which we need not opine, it is abundantly clear that the denial of acting time falls under the "materially adverse" rubric--and that alone suffices to support Jordan's claim.

Acting time, it will be recalled, occurs when there is no officer designated to work on a shift.[13] According to Division policy, acting time is granted on the basis of (1) vacancy and (2) seniority. Jordan was denied acting time, despite being the senior firefighter on his shift, on three specific occasions identified in the record. First, in December 1999 roving officers were placed on Jordan's shift despite the fact that such a placement left more junior firefighters in other companies running their shifts. Second, shortly after Jordan complained about the placement of roving officers, Readinger (with Norman's consent) issued a flat policy denying Jordan acting time because of his purported failure to perform inspections. Third, even after Jordan proved that he had in fact performed inspections and Readinger (tacitly) admitted the same, Jordan was involuntarily transferred out of 11's house and detailed all over the city to battalions and on house shifts where he was no longer the senior firefighter (or in the case of 26's house, where he was the senior firefighter, but where the firefighters filed a grievance to prevent him from receiving acting time).

As Jordan's counsel elaborated at oral argument, the repeated denial of acting time resulted in a significant loss of economic benefits--money.[14] Firefighter shifts are 24-hour shifts, so when a firefighter "acts" as a Lieutenant, he gets paid as a Lieutenant for the entire shift. That denial of money would more than amply qualify as a materially adverse action as to any reasonable employee for Title VII purposes.[15]

## 2. Racial Harassment

Cleveland also attempts to escape liability on Jordan's racial harassment claim because the actions that Jordan complained of at trial were assertedly neither (1) race-based nor (2) sufficiently severe or pervasive to make out a Title VII claim. But the record refutes both of those contentions.[16]

As to Cleveland's first contention, it is axiomatic that on this claim Jordan must provide a causal nexus between his race and the complained-of conduct. Proof of discriminatory animus presents "an elusive factual question" that is often difficult to determine by way of direct proof (*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004)). Inferences are therefore often used and can be drawn in a number of ways. For example, "[f]acially neutral abusive conduct can support a finding of...animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly...discriminatory conduct" (*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999); see also *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999)). Additionally, despite Cleveland's argument to the contrary, evidence that an employer has "direct[ed] its discriminatory acts or practices at the protected group of which the plaintiff is a member" is probative of whether the employer has created a hostile work environment for the plaintiff-employee (see *Jackson*, 191 F.3d at 661).

---

[13]Cleveland attempts to misstate the record by characterizing the grant of acting time as entirely discretionary. That, however, is belied by the statements of Stubbs and by the Division's own policy.

[14]Moreover, the denial of acting time results in "significantly diminished material responsibilities," for Jordan was not only paid as a Lieutenant when acting as one but also had a Lieutenant's responsibilities (see *Koscis*, 97 F.3d at 886).

[15]Cleveland seeks to escape that outcome by analogizing Jordan's case to *Hollins v. Atl. Co.,* 188 F.3d 652 (6th Cir. 1999), but the two situations are markedly different: Unlike Jordan, the plaintiff there failed to establish any real linkage between the complained-of conduct and her level of compensation.

[16]Again Cleveland's selective portrayal of the evidence from its own perspective, ignoring the evidence favoring Jordan, is impermissible.

Here there was ample evidence from which a jury could find that the harassment Jordan experienced was motivated by his race.[17] During Jordan's tenure at the Division he was subject to a plethora of racially offensive jokes, racist graffiti and derogatory comments, including being called a "Sambo" and a "Welfare Fighter." In addition to such overtly racist conduct, Jordan experienced isolation when stationed on all-white shifts and segregation within the Division. Most black firefighters were stationed at "Monkey Island" and, when possible, placed on all-black shifts. Jordan presented evidence that such segregation at least affected (if not animated) the problems he had with the climate at 11's house and his turnout gear at 26's house.

But racial insults, isolation and segregation were not the only indignities that Jordan faced while working at the Division. Jordan--both when supervised by Hart and at 20's house--suffered from demeaning and disparate treatment as well. As soon as Hart came to 11's house and onto shift A, he announced that there were certain persons that he wanted off his shift. Hart then engaged in a pattern of confrontational and caustic behavior toward a group of firefighters who were almost exclusively black. For Jordan that treatment only escalated after he complained about Hart, who thereafter required Jordan to perform extra and demeaning duties and additional drilling.

From that sequence of events a jury could reasonably infer that Hart's treatment of Jordan was based on race. And the same can be said of the Division's treatment of Jordan at 20's house. There, after missing one run, Jordan was put on charges. Those charges were later dropped only after Stubbs notified Gerrity that no white firefighter had ever been subject to charges for the same behavior. It is thus an understatement to say that the jury could reasonably have found Jordan was harassed based on his race.[18]

Cleveland's second argument--that the district court erred in denying it judgment as a matter of law because the conduct at issue was not severe or pervasive--is equally unpersuasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) teaches:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

That analysis must be made from both an objective and a subjective perspective (*id.* at 21-22). Whether conduct is severe or pervasive is "quintessentially a question of fact" (*O'Shea*, 185 F.3d at 1098).

---

[17] Cleveland contests the presentation of much of this evidence as "far removed in time." To be sure, some of the conduct that Jordan challenges occurred outside of the 300-day window established under Title VII. But because that conduct continued well into the filing period (and relates back to the conduct preceding that period), the earlier conduct can be considered in evaluating Jordan's claim for racial harassment. As *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002)(footnote omitted) explained:

> Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be considered by a court for the purposes of determining liability.

> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring.

[18] It should not go unremarked that Stubbs, the Division's own EEOC officer during much of the time at issue, testified at trial that he believed there was a racially hostile environment at the Division.

Here a reasonable jury could find that the factors taken together--the various racial slurs, demeaning jokes and inflammatory graffiti, the isolation and segregation within the Division and the disparate discipline and additional duties to which Jordan was subjected--were sufficiently severe or pervasive to alter the conditions of Jordan's employment and to create an abusive work environment. For more than a decade Jordan was consistently subjected to varieties of offensive conduct that were humiliating and degrading to him as well as to African Americans as a class. Moreover, the harassment became so oppressive that it ultimately drove Jordan from his job: He took an early retirement (on the basis of stress) from the Division at age 39. Hence a rational jury could find both that a reasonable person would and that Jordan did regard the work environment at Division as abusive.

### 3. Retaliatory Harassment

Cleveland relies on the same contention as to Jordan's retaliatory harassment claim, once more claiming that the conduct of which Jordan complains was not severe or pervasive. That argument again falls flat.

Just as was true of Jordan's racial harassment claim, a claim for retaliatory harassment depends on proof that the harassment was severe or pervasive (*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). There is of course "no mathematically precise test" for such a determination--instead the same totality-of-the-circumstances analysis controls (*Harris*, 510 U.S. at 22).

Here too it is plain that a reasonable jury could conclude that Jordan was subjected to severe or pervasive retaliatory harassment. Retaliatory conduct targeting Jordan began once Hart arrived at 11's house and continued through 2001.[19] Several aspects of the record support that conclusion.

First, in 1998--right after Jordan filed his EEOC charge and Form 10s against Hart charging harassment and discrimination--Hart made good on his promise to make "trouble" for Jordan if he were to complain about Hart. In particular, Hart started to make Jordan drill, scrub the floors and wash the fire apparatus, despite Jordan's senior status and despite the fact that those chores were typically company-wide tasks.

Second, after Jordan voiced complaints about being denied acting time in December 1999 and March 2000, he was further denied acting time and was involuntarily detailed to shifts at station houses where he was either the junior firefighter or the only black firefighter. Jordan was also belittled and branded difficult by his supervisors for voicing his objections to that conduct: For example, Heil characterized Jordan's complaints as "bullshit," Hatzsegi announced that Jordan was 11's "problem" sent to 36's house for them to handle, and Miklowski told Jordan to stop making "false accusations." Unsurprisingly, those purportedly false accusations remained unanswered.

Third, five days after EEOC issued its "Probable Cause" finding in April 2001, Jordan came to work to find that Miklowski had stuffed his gear into a basketball hoop (tearing his gear and thus creating a serious risk for any firefighter). After a brief phone conversation Miklowski came to the house to confront Jordan--and he later conceded to Plues, Jordan and Fallon that he had been the aggressor. Nevertheless it was Jordan who was threatened not to take the matter "downtown," forced to apologize to his co-workers (and called a "coward" when he did not) and was still subjected to the same turnout gear "tradition."

---

[19]Again, as already noted, where at least some of the related conduct occurred within the statutory filing period, conduct antedating that time frame can be considered for purposes of liability (see *Morgan*, 536 U.S. at 117).

In the aggregate "[t]his behavior clearly constitutes more than simple teasing, offhand comments, and isolated incidents that *Faragher* indicated did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment" (*Morris*, 201 F.3d at 793). In sum, judgment as a matter of law was not warranted on that claim either.

In its last bite at the same apple, Cleveland urges that the district court erred in its retaliatory harassment charge by failing to instruct the jury (1) that the harassment had to be severe or pervasive and (2) that Cleveland was entitled to an affirmative defense if it could show (in conjunction with its own reasonable care) that Jordan unreasonably failed to take advantage of any preventive or corrective measures offered by Cleveland. It concedes that it did not object to the instructions as required by Rule 51, so that Rule 51(d)(2) prescribes that our review is limited to determining whether the instruction constituted "clear and prejudicial error" (*Chonich v. Wayne County Comm. Coll.*, 973 F.2d 1271, 1275 (6th Cir. 1992)).

It did not. It is clear from the record (which Cleveland notably cites only twice in its submissions on this issue) that the district court instructed the jury properly on the two issues that Cleveland contests. After summation the district court submitted five claims to the jury: (1) racial harassment with a tangible employment action; (2) racial harassment by a supervisor without a tangible employment action; (3) racial harassment by a co-worker without a tangible employment action; (4) unlawful retaliation resulting in an adverse employment action; and (5) retaliatory harassment without a tangible employment action (J.A. 259-63). In its charge the district court went through each of the elements for the claims seriatim, starting with (1) and finishing with (5) (*id*. 2682-2701). In describing the elements required for Jordan's first claim, racial harassment with a tangible employment action, the district court provided a thorough description of the concept of a "hostile work environment" (*id*. 2696) (emphasis added):

> Now a hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is *sufficiently severe or pervasive* to alter the conditions of the victim's employment, and create an abusive working environment. Both an objective and subjective test must be met; the conduct must be *severe or pervasive* enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.
>
> Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. Appropriate factors to consider when determining whether conduct is *severe or pervasive* enough to constitute a hostile work environment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

After providing that definition, the district court continued its charge as to Jordan's remaining counts. Instead of reiterating that lengthy explanation, the district court simply (and sensibly) stated that for Jordan's claims of racial and retaliatory harassment without a tangible employment action to succeed, Jordan had to prove that the harassment created a "hostile work environment"--the concept that, as stated earlier, embodied the requirement that the harassment be severe or pervasive (J.A. 2697, 2700).[20]

---

[20]Cleveland challenges the district court's failure to replow the same field only as to Jordan's retaliatory harassment claim, even though no repetition of the "hostile work environment" concept was given for the later claims of racial harassment.

Cleveland has understandably been unable to point to any cases that would require such repetition of the already-given detailed explanation. It cites only to *Aetna Ins. Co. v. Reed*, 33 Ohio St. 283 (1877), but that ancient case merely holds that jury instructions must be sufficiently clear and provide a correct statement of the law (*id*. at 293-94), and the instructions given here met that standard admirably.

Similarly, the jury was effectively charged on the second prong of Cleveland's affirmative defense. In its retaliatory harassment charge the district court stated specifically (J.A. 2701):

> You must find for defendant, the City of Cleveland, if you find defendant has proved by a preponderance of the evidence its affirmative defense: First, that the defendant exercised reasonable care to prevent and correct promptly any racially harassing behavior; and second, the plaintiff, Emmett Jordan, unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid Emmett harm.

In short, we are at a loss to understand what more Cleveland wanted the district court to say about the second prong of its affirmative defense. In sum, we reject Cleveland's appeal of the jury instructions as well.

### Case No. 04-3436: Cross-Appeal

But Cleveland is not alone in appealing the district court's rulings at trial. In Case No. 04-3436 Jordan cross-appeals the district court's refusal to permit him to present evidence of economic damages because of his supposed failure to comply with Rule 26(a). We review a district court's decision to impose sanctions for any such noncompliance under an abuse-of-discretion standard (see *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)).

Rule 26(a)(1)(c) mandates:

> Except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties:
>
> *     *     *
>
> (c)  a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Under Rule 37(c)(1) "[a] party that without substantial justification fails to disclose information required by Rule 26(a)" is not permitted to use the information that should have been disclosed "at trial, at a hearing, or on a motion," unless the failure to provide such information is harmless.

Cleveland filed a motion in limine to bar any evidence "introducing or referring to any computation for damages" because of Jordan's asserted failure to provide such Rule 26(a)(1)(c) disclosures (J.A. 173). That motion was granted initially and on reconsideration by a district judge and then a magistrate judge, neither of whom had handled the case from its inception, but both of whom relied on a purported Rule 26(a)(1)(c) breach claimed to have taken place before they came

onto the scene (J.A. 190-95, 236-41).[21]  But in doing so those judges inexplicably ignored the fact that Rule 26(a)(1)(c) had expressly been made inapplicable to the case.

It will be remembered that Rule 26 does not apply "to the extent otherwise stipulated or directed by order" (Rule 26(a)(1)).  Here the original judge to whom the case was assigned, District Judge Nugent, issued just such an order at the inception of the case (J.A. 30) (emphasis added):

> <u>X</u>  Initial Disclosures (Rule 26(a)(1)) *shall not apply*; Disclosure of Expert Testimony (Rule 26(a)(2)) and Pre-Trial Disclosures (Rule 26(a)(3)) shall apply.

That order was never modified, let alone vacated.  Hence Jordan had no duty under the federal rules to disclose the documents upon which his damages computation was based.  That being so, sanctions under Rule 37 were entirely inappropriate (see, e.g., *Litle & Co. v. Mann*, No. 96-56857, 1998 WL 231202, at *1 (9th Cir. April 28)).[22]

Cleveland has tried to escape that obvious error by arguing in its brief and at oral argument that Rule 26(a)(3), which all parties agree remained in effect, required Jordan to make Rule 26(a)(1)(c) disclosures.  But that contention impermissibly strains the plain reading of Rule 23(a)(3), which calls for the exchange of pretrial disclosures "[i]n addition to the disclosures required by Rule 26(a)(1) and (2)."  By its terms Rule 26(a)(3) does not raise Rule 26(a)(1)'s requirements, Lazarus-like, from the dead.

We therefore reverse the district court's ruling excluding evidence of economic damages.  We remand the damages aspect of the case to the district court for an evidentiary hearing as to Jordan's entitlement to back and front pay and as to the amount of any such damages.  Because those issues are for jury determination under this Circuit's caselaw, a jury convened for that purpose will have to be fully apprised of Cleveland's liability on the merits, as confirmed by this opinion--unless of course the parties were to consent jointly to a bench trial of the issue.

## Case No. 05-3808: Attorney's Fees

This opinion comes to a close with its consideration of Case No. 05-3808, in which Jordan challenges three aspects of the district court's opinion awarding his counsel attorney's fees: (1) the deduction of 64 hours during which counsel waited for the jury verdict, (2) the reduction by 40 percent of the attorney's fees for failure to prevail on all claims and (3) the denial of a fee multiplier. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994) (citations omitted) is exemplary of our cases stating the methodology for the determination of a reasonable attorney's fee award:

> A starting point is to calculate "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  (This is known as the "lodestar" calculation.)  The court should then exclude excessive, redundant

---

[21] Jordan's case was transferred from Judge Donald Nugent to Judge John Adams as part of the latter's initial calendar on his taking the federal bench on March 4, 2003 (J.A. 44).  On January 16, 2004 Judge Adams first ruled on Cleveland's motion in limine (J.A. 190-95).  But because Judge Adams ordered that Jordan's trial be held from 4:30 p.m. to 8:30 p.m. (another case was being tried during the normal trial day), both parties, fearing prejudice, consented at the last minute to the jurisdiction of Magistrate Judge James Gallas (J.A. 189, 230).  Judge Gallas took jurisdiction over the case on January 20, upheld the granting of the motion in limine two weeks later and began trial the very next day, on February 4 (J.A. 236-41).

[22] Such inappropriateness is underscored by the facts that Cleveland had all the information relevant to the computation of damages in *its* possession, that it made no opportunity to confer with Jordan to access any damages information before bringing its motion in limine and that it had a full opportunity during Jordan's deposition to question him about damages (see *Nieto v. Kapoor*, 182 F. Supp. 2d 1114, 1147 (D. N.M. 2000)).

or otherwise unnecessary hours. Next, the resulting sum should be adjusted to reflect the "result obtained." This involves two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"

We review a district court's application of that step-by-step analysis for an abuse of discretion (*id*. at 531-32).

Jordan first argues that the district court incorrectly determined the "lodestar" figure because it excluded 64 of the 68 hours during which his counsel was in attendance at the courthouse waiting for the jury verdict. Jordan seeks to analogize his case to *Roberts v. Interstate Distrib. Co*., 242 F.Supp.2d 850, 860 (D. Or. 2002), which allowed prevailing counsel to include in its hours calculation 3.5 hours for "jury watch" (waiting for the jury verdict). But in *Roberts* the parties' counsel were operating under an order that required them to be within 15 minutes of the courthouse while the jury was deliberating (*id*.). Because plaintiff's counsel worked in a different city, that prevented her from returning to her office and limited the type of work she could perform for other clients during the deliberations (*id*.).

In contrast, Jordan's counsel offices in Akron, where the trial was held. There was no court mandate for counsel to stay at the courthouse. Indeed, the district court suggested the opposite in its fees opinion (J.A.F. 187). There is also a great disparity in the magnitude of the claim: *Roberts* involved a limited 3.5 hours for "jury watch," while Jordan's counsel requested 68 hours (4 of which were granted). Simply put, there was no abuse of discretion under the circumstances (see, e.g., *Alfonso v. Aufiero*, 66 F. Supp. 2d 183, 193 (D. Mass. 1999)).

Second, Jordan contends that the district court erred in further reducing the fee award by 40% across the board.[23] In that respect the district court stated it was reducing the award based on Jordan's failure to prevail on "the majority of his accusations made against his former employer" (J.A.F. 186). Although the opinion is not entirely clear on that score, it appears that the court considered Jordan's "failed" accusations to include a supposed claim for promotions, as well as claims for racial discrimination, racial harassment with a tangible employment action and racial harassment by a co-worker.

But Jordan never pleaded a claim based on the denial of promotion as such--instead the issue was raised in partial support of his racial discrimination claim in his Complaint and in his response to Cleveland's summary judgment motion (see J.A.F. 3-4, 65-66, 72). Jordan then stipulated to a voluntary dismissal of any potential promotion claim that he may have initially or apparently asserted, and his counsel removed from the fee petition the 1.5 hours that had been spent exploring that issue. So any deduction made on the basis of an assertedly failed promotion claim was plainly an abuse of discretion.

---

[23]Jordan makes a number of related claims on that issue: (1) an assertedly improper reduction of the award by 40% without first determining the lodestar calculation, (2) a reduction for so-called "lost claims" that were never pleaded or pursued by Jordan and (3) a finding that the claims on which he lost were discrete and unrelated to his successful claims. We address only the latter two arguments in the ensuing text. As to the first, although the structure of the district court's fees opinion might lead one to believe otherwise, the concluding paragraph of that opinion indicates that the magistrate judge properly first determined the lodestar amount and then reduced that amount by 40% (J.A.F. 195).

It was likewise an abuse of discretion for the district court to deduct fees based on Jordan's failure to succeed on either his racial discrimination or his racial harassment claims.[24]  In that regard the seminal opinion in *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) explained that when claims "involve a common core of facts" or are "based on related legal theories," the district court's rejection of certain grounds is not a sufficient reason for reducing a fee.  There is no precise test for determining whether claims are related (see *id.* at 437 n.12), although our sister circuits have focused on "whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised" (see, e.g., *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 903 (9th Cir. 1995) (internal quotations omitted) and cases cited there).

We reject the district court's view of Jordan's case as involving "distinct causes of action with distinct remedies" (J.A.F. 185).  For purposes of analysis, Jordan's "unsuccessful claims" can be spliced into two categories: (1) his racial discrimination claim, which succumbed at the summary judgment stage, and (2) his racial harassment claims, on which the trial jury returned a verdict for Cleveland.

As to the former, Jordan's racial discrimination claim arose out of precisely the same facts and related legal theories as Jordan's successful retaliation and harassment claims.  We need look no further than the parties' own briefing and the district court's opinion on summary judgment for proof that common facts were at the heart of all the claims, both successful and unsuccessful.  In assessing Jordan's racial discrimination claim, both the parties' memoranda and the district court's opinion focused on his treatment at 11's house--including the additional duties to which Hart subjected him and the transfers from that house that caused the denial of acting time (C.A.F. 39; J.A.F. 34-3672-73).  Those selfsame facts formed the crux of Jordan's retaliation and racial harassment claims.  Moreover, there is an obvious and significant legal overlap between Jordan's claims of racial discrimination and harassment.  For example, proof of a racially hostile atmosphere is also probative of racial animus and disparate treatment (see *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998)).  In *Hensley* terms, all of that calls for a full recovery for counsel's services, rather than a percentage reduction.

There was similarly no basis on which a deduction could be made for Jordan's inability to prove up racial harassment by establishing a tangible employment action and racial harassment by a co-worker.  Those unsuccessful claims cannot be divorced from  Jordan's successful racial harassment claim (indeed, they are derivatives of it) or from his equally successful retaliatory harassment claim.  All of the claims involved the same set of facts and, for the racial harassment claims, a virtually identical legal theory.

What has been said to this point brings into play the doctrine announced in *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996)):

> When claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced.

That is so because litigation is not an "exact science": Lawyers cannot preordain which claims will carry the day and which will be treated less favorably.  Good lawyering as well as ethical compliance often requires lawyers to plead in the alternative (see *Goos v. Nat'l Ass'n of Realtors*, 68 F.3d 1380, 1386 (D.C. Cir. 1995)).  Fee awards comport with that reality by giving full credit to

---

[24]It is relatedly worth noting that Jordan never pleaded or pursued a claim of racial discrimination based on a disparate impact theory, yet the district court ruled on that subject in its summary judgment opinion and mentioned it in the fees order.  That provides further evidence of the skewed approach taken below to Jordan's fee request.

a meaningfully successful plaintiff, rather than making a mechanical per-losing-claim deduction from an attorney's fee award (*Hensley*, 461 U.S. at 435).[25]

Here Jordan's results were nothing short of exemplary. He prevailed on a substantial number of claims that he pursued, obtained virtually all of the types of relief he requested--including back and front pay and compensatory damages.[26]  Any reduction from the lodestar amount of attorney's fees is not only unwarranted but an abuse of discretion.

Finally, Jordan's third challenge to the district court's fee order argues that the district court's ruling on his motion for a fee enhancement was in error. In some cases of "exceptional success" counsel may be entitled to a fee multiplier (*Barnes*, 401 F.3d at 745). We have held (*id.* at 745-46) that in evaluating such a request a district court may consider the 12-factor test announced in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

In this instance the district court denied Jordan an enhancement on three grounds: (1) Jordan's counsel's asserted abuse of the disclosure and discovery process, (2) the fact that the case was neither novel nor difficult and (3) Jordan's failure to prevail on all of the claims that he asserted.[27]  None of those survives objective scrutiny.

First, there is no evidence to support the district court's finding that Jordan's counsel abused the discovery process. We have already dealt with the district court's mistaken reliance on the absence of Rule 26(a)(1) disclosures--something that had been ordered by the original judge in the case and never modified. In addition, the district court pointed to Jordan's production of two photographs during trial as evidence that Jordan's counsel "unreasonably resisted providing discovery to defendant" (J.A.F. 194). But Jordan explained that he had only acquired those photographs on that day and that he sought to introduce them (unsuccessfully) as rebuttal evidence.[28] It was entirely inappropriate to discredit Jordan's attorneys on this first basis.

---

[25]Moreover, awarding fees for services connected with related claims, though the claims prove unsuccessful, "supports the underlying purpose of...encouraging attorneys to take on civil rights actions in view of the ethical duty of zealous representation" (*Goos*, 68 F.3d at 1386).

[26]Indeed, Jordan secured far more than the $50,000 in compensatory damages that he originally sought. Only his request for punitive damages fell by the wayside.

[27]In addition, the district court's opinion made a passing reference to the fact that "counsel was not clear whether this case was taken on contingency. Counsel related only that that is their general practice" (J.A.F. 195). Though we cannot tell whether the district court took that into account in its analysis, any contingency risk involved in a case is not itself a valid ground for enhancement under federal fee-shifting statutes (see *Paschal v. Flagstar Bank FSB*, 297 F.3d 431, 435 (6th Cir. 2002)).

[28]Cleveland's briefs have not responded to the record-supported statements in Jordan's briefs that Cleveland's counsel, not Jordan's, were the offenders when it came to discovery noncompliance.

Nor was it proper, as the district court did, to deny enhancement on the premise that the case was neither novel nor difficult. Although the legal issues in Title VII cases are generally well marked out, they are often difficult to prove. To do so Jordan's counsel had to expend substantial effort in marshaling evidence about the Division and its adverse treatment of Jordan (and other black firefighters) over the course of more than 10 years. That effort is surely relevant to any consideration of a fee enhancement (see *Paschal*, 297 F.3d at 436), but it was not taken into account here. Instead the district court drew from its finding that "this case was a bellwether to similar cases filed by Cleveland City firefighters" that the case was both desirable and straightforward (J.A.F. 195). But any such ipse dixit assertion is far from self-evident.

Finally, the district court noted that it would be anomalous to reduce counsel's fee by 40% and then enhance that reduced amount with a multiplier. Of course we have already rejected the percentage reduction--the underpinning for that rationale. But the court's basic premise would be flawed even if some such reduction were in order because of a partial lack of success on some discrete claim. On the district court's view, a plaintiff's counsel could never receive a fee enhancement unless counsel won on all of the plaintiff's discrete claims, regardless of whether the same relief was obtained by a win on one or more other claims and regardless of whether the *Johnson* factors were satisfied for that claim or claims. That view is not only negated by relevant caselaw (see *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 910 (6th Cir. 1991)) but also ignores the reality of litigation and the mandate of *Hensley*, 461 U.S. at 436 that the most important factor in determining the appropriateness of a fee award is the degree of success obtained.

Thus the district court's finding as to the inappropriateness of a multiplier also cannot stand. It was infected by the court's erroneous Rule 26(a)(1) determination and impacted by its overly narrow view of employment discrimination claims and litigation generally.

In summary, the fee award issue must be revisited because of the flaws identified in this opinion. Only one of those (the time spent in awaiting the jury verdict) cuts against Jordan--the others operate in his favor, though the issue of possible enhancement of the proper lodestar by a multiplier is left to the district court's sound discretion. And because the entire matter of fees is being remanded to the district court, it should add to the mix (1) all fees incurred on the current appeal and (2) all fees incurred on the remanded issue of Jordan's economic damages.

### Conclusion

For the reasons set forth in this opinion, we **AFFIRM** the district court's denial of Cleveland's Rule 50 motion and reject Cleveland's challenge to the district court's jury instructions, thus upholding the verdict as to Cleveland's liability to Jordan in its entirety. We **REVERSE** the district court's rulings on economic damages and attorney's fees and **REMAND** the case to the district court for further proceedings consistent with this opinion.